**UNITED STATES of America, Plaintiff,**

**v.**

**Elbert Lamar COLEMAN, Defendant.**

**Crim. No. 6–81259.**

United States District Court,
E. D. Michigan, S. D.

March 31, 1978.

---

Victoria Toensing, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

John N. Thompson, Federal Defenders Office, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO SUPPRESS

PHILIP PRATT, District Judge.

Elbert Lamar Coleman is charged with the offense of possessing a controlled sub-

stance with intent to distribute the same, in violation of 21 U.S.C. § 841(a)(1). The substance in question is a certain quantity of cocaine which an agent of the Drug Enforcement Administration allegedly discovered in defendant's possession under the circumstances set forth below. Arguing that he was stopped on less than reasonable suspicion and arrested on less than probable cause, defendant moves this Court to exclude the cocaine from evidence under the rule declared in *Weeks v. U. S.*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) and its progeny. A suppression hearing was conducted in October of 1977.

Because it finds, for the reasons stated below, that the investigative stop does not pass constitutional muster under the standards announced in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967) and elucidated in recent opinions of the Sixth Circuit Court of Appeals, the Court grants the motion and, consequently, directs that the cocaine be suppressed.

■ Since it is clear that defendant was subjected to a seizure of his person, that the cocaine was seized in the course of that encounter,[1] and that those seizures were effected without benefit of a warrant, the burden is on the government to justify the eventual introduction of the cocaine into evidence at trial. *Coolidge v. N. H.*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *U. S. v. Murrie*, 534 F.2d 695 (6th Cir. 1976). At the suppression hearing the government presented the testimony of two witnesses, viz., Special Agent Paul Markonni of the Drug Enforcement Administration and a Mr. Edward J. Pelczar. The facts disclosed at the hearing are as follows.

On September 26, 1976 Agent Markonni was on duty at Detroit Metropolitan Airport. In mid-afternoon he stationed himself in a vantage point from which he could clearly observe passengers disembark from an airplane arriving directly from Los Angeles, California. He was particularly alert to such flights because Los Angeles bears the distinction of being the most significant distribution point for heroin in this country and also figures prominently in the distribution pattern of other controlled substances, such as cocaine. On this occasion he noticed, among others who emerged, a relatively young black man who, without hand luggage of any kind, walked directly through the terminal and who, unlike other passengers, did not head down to the lower level where baggage was to be retrieved.[2] Instead, the person being observed walked out of the terminal, was met by a woman, and together they proceeded toward an area of metered, i. e., short-time parking. Agent Markonni was able to identify the defendant as the person in question.

On the sidewalk at some distance from the entrance to the terminal, Markonni approached defendant and his companion and stopped them. He identified himself as a Drug Enforcement Administration (DEA) agent and asked defendant to produce identification. Defendant handed over his Michigan driver's license with a trembling hand. Noting the defendant's nervousness, Markonni asked him to show his airline ticket. Inspection disclosed that the ticket was issued to an L. Cole, while the driver's license identified defendant as Elbert Coleman. There were no baggage tags stapled to the ticket folder.

At this point, Markonni asked defendant to accompany him to a more private place, intending to pursue the investigation in a room inside the terminal assigned to the DEA. Defendant responded saying "Okay" and kissed his companion in a manner which suggested to Markonni that defendant did not expect to be returning soon. The two headed toward the terminal. After a short while, defendant turned abrupt-

---

1. The government's argument that the defendant abandoned the cocaine and that, consequently, by virtue of the abandonment, it no longer bears the taint of an illegal arrest, is considered *infra*.

2. Agent Markonni further testified that while defendant was neither the only passenger without hand luggage nor the only one who did not go directly down to the baggage area, he was the first to proceed straight through the terminal and exit.

ly and bolted off in the opposite direction. Markonni called upon him to stop and threatened to fire, whereupon defendant threw a white envelope over a guard rail and down a parapet separating the lower roadway from the upper, halted, and placed his hands against a nearby wall. Markonni formally arrested defendant and then called upon Mr. Pelczar, passing by on the sidewalk at the level below, to retrieve the envelope, which Markonni was able to identify clearly as the one which defendant had thrown. Mr. Pelczar held the envelope until Markonni was able to take possession of it.

The envelope was found to contain a quantity of white powder which later proved to be cocaine.

The defendant's position is that he was subjected to both a stop and an arrest, that neither met the constitutional standards embodied in the Fourth Amendment, and therefore that the seized cocaine is inadmissible at trial under the exclusionary rule. The government, on the other hand, contends that both the stop and the arrest were legal (although it disagrees with defendant as to when each was consummated for Fourth Amendment purposes), that seizure of the cocaine was justified under the "plain view" exception to the warrant requirement, and that defendant, having abandoned the cocaine, lacks standing to object to its introduction into evidence at trial.

■ Logically, the Court should consider first the issue of defendant's standing to challenge the legality of Markonni's seizure of the cocaine in question. "The 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)." *Flast v. Cohen*, 392 U.S. 83 (1968) at 99, 88 S.Ct. 1942 at 1952, 20 L.Ed.2d 947. Traditionally this has meant that federal courts will not

put themselves at the disposal of would-be parties who desire to litigate the rights of third parties, their own legal interests not being directly involved. *Tileston v. Ullman*, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943). In terms of Fourth Amendment jurisprudence, the Supreme Court has declared that "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved by the introduction of damaging evidence." *Alderman v. U. S.*, 394 U.S. 165 (1969) at 171–172, 89 S.Ct. 961 at 965, 22 L.Ed.2d 176. Now, of course, consistent with the principle declared in *Katz v. U. S.*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the focus of inquiry is on the question of whether at the time of the search and/or seizure the defendant had a reasonable expectation of privacy in the area searched or the item seized.

■ It is not directly to these principles that the government refers, however, for its contention is that defendant, in effect, broke the nexus between the stop and/or search (assuming *arguendo* that either or both were illegal) when he threw the envelope containing the cocaine away and, thus, abandoned it. In so arguing it relies on a line of recent Fifth Circuit cases. *U. S. v. Colbert*, 474 F.2d 174 (5th Cir. 1973); *U. S. v. Maryland*, 479 F.2d 566 (5th Cir. 1973). Assuming (without deciding) both that the automatic standing rule of *Jones v. U. S.*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) and its progeny is inapplicable to this case and that the abandonment-standing rule declared in *Colbert* and *Maryland* is to be observed by courts in this Circuit, the Court finds that to bring itself within the terms of that rule as announced and explained by the Fifth Circuit the government has the burden of establishing the legality of the stop and the arrest, for as the court stated in *Maryland, supra* at 568:

"[O]ne has no standing to challenge the search of an area or thing he has voluntarily abandoned and . . . '[p]olice investigation does not of itself render an

abandonment involuntary.' *United States v. Colbert*, 5th Cir. 1933, en banc, 474 F.2d 174 at 176 (1973). . . .

"[However,] if appellant's arrest was lawful, the abandonment was clearly voluntary. As noted above, a lawful arrest does not in itself amount to such compulsion as will render an otherwise voluntary abandonment involuntary. [4 citations omitted.] The government's standing argument does not, however, eliminate the necessity to determine the legality of the arrest, for a loss of standing to challenge a search cannot be brought about by unlawful police conduct. [3 citations omitted.] If there is a 'nexus between . . lawless [police] conduct and the discovery of the challenged evidence' which has not ' "become so attenuated as to dissipate the taint," ' then the evidence should be suppressed. [Citation omitted.]"

As in *Maryland*, the facts of this case present a strong nexus between Markonni's conduct and defendant's throwing the envelope away. The suggestion that the nexus has been broken or at least sufficiently attenuated does not, in this case, survive under the penetrating light of clear statement. Therefore, the government's abandonment issue does not advance the inquiry in any fashion, and attention must properly be directed to the issues raised by defendant.[3] *See also U. S. v. Chamblis*, 425 F.Supp. 1330, 1335 (E.D.Mich.1977) (Churchill, J.).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,

. . . ." This is the bedrock principle on which is grounded the right of persons within the United States to conduct their affairs free of unwarranted governmental scrutiny, intrusion, and interference. This right to be left alone sometimes comes into conflict with the proper performance of necessary tasks of law enforcement, and the resolution of that conflict has inspired much of the development of our Fourth Amendment jurisprudence. One of the most significant chapters of that evolution, the chapter most germane to the issue at hand, has arisen out of the case of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), in which the Supreme Court elaborated a most significant accommodation between these two legitimate interests. The Court there held that upon meeting a standard of knowledge which has since been commonly known under the rubric "reasonable suspicion" that criminal activity is afoot, law enforcement officers may stop a person for purposes of investigation and, if in reasonable apprehension that the person so stopped is armed, they may, incidentally to the stop, conduct a limited search for weapons.

Efforts directed against drug-trafficking have called for an extension of the *Terry* "stop and frisk" doctrine; more specifically, the activities of DEA agents at airports have occasioned much litigation in this regard, including much which has reached the Sixth Circuit. The precepts of *Terry* applicable to this situation were succinctly expounded upon in the recent case of *U. S. v. Pope*, 561 F.2d 663 (6th Cir. 1977) at 667:

**3.** The Court is of a similar mind with respect to the government's "plain view" argument. Even assuming *arguendo* that plain view of a plain white envelope under the circumstances here described made the envelope subject to seizure, *see U. S. v. Shye*, 473 F.2d 1061 (6th Cir. 1973), one of the indispensable predicates of the plain-view exception to the Fourth Amendment's warrant requirement is that the seizing officer be lawfully in a position to have the view. The now-classic formulation of the plain-view doctrine was supplied in *Harris v. U. S.*, 390 U.S. 234 (1968) at 236, 88 S.Ct. 992 at 993, 19 L.Ed.2d 1067: "It has long been settled that objects falling in the plain view of an

officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." It follows (albeit by negative implication) that if the officer does not come into view of the seized object in the course of lawful conduct, the seizure is not justified by the plain-view exception. *See Coolidge v. N. H.*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In the instant case this means that if it was in the course of an illegal arrest that Markonni came to view the envelope, the exception is unavailable to the government. Thus, again, attention is to be focused on the legality of the stop and the arrest.

"In *Terry* the Supreme Court held that a law enforcement officer is entitled to stop an individual on the street to investigate suspicious behavior if the officer is 'able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.' 392 U.S. at 21, 88 S.Ct. at 1880. The officer may not rely on 'mere suspicion' or a 'hunch' to justify the stop, but due consideration is afforded specific reasonable inferences the officer is entitled to draw in light of his law enforcement experience. *Id.* at 27, 88 S.Ct. 1868. Later cases have dubbed the lesser standard of knowledge required for a *Terry* stop 'reasonable suspicion' and have gauged the reasonableness of particular investigative stops by striking 'a balance between the public interest [behind the investigation] and the individual's right to personal security free from arbitrary interference from law officers.' *United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975). Where the public interest served by the officer's investigation is great and the intrusion on individual privacy is small, investigative stops of limited duration and 'reasonably related in scope to the justification for their initiation' have been upheld. *United States v. Brignoni—Ponce,* 422 U.S. at 881, 95 S.Ct. at 2580, *citing Terry v. Ohio,* 392 U.S. at 29, 88 S.Ct. 1868."

■ Thus, to ensure that people be protected from *arbitrary* police interference with their activities, the officer who contemplates an investigative stop must be prepared to account for his decision (if he decides to act) by setting out before a detached and neutral judicial officer the factors which prompted him to do so. If he is equipped with "specific and articulable facts" to point to, he may proceed, and if the consequent investigation discloses such

additional facts as would give rise to probable cause to believe that the person stopped has committed or is committing a crime,[4] he may make an arrest.

■ On the other hand, unless the initial stop was based on such reasonable suspicion as to justify the intrusion under these standards, the stop is illegal and any consequent arrest is illegal, regardless of how much probable cause for arrest the illegal stop disclosed. Any other rule would seriously disturb the balance which the Supreme Court struck in *Terry* and would tend to nullify the accommodation it worked out there and in subsequent cases. *See U. S. v. Canales,* 572 F.2d 1182 at 1185–1186, (6th Cir. 1978); *U. S. v. Pope, supra* at 668.

■ The threshold question is when the "stop" occurred, for purposes of *Terry* analysis. Of course not all contacts between law-enforcement officers and private citizens which are initiated by the officer must be grounded on reasonable suspicion that criminal activity is afoot. Police officers are not called upon to discard all vestiges of courtesy and friendliness, of civility and humanity, nor are they to be prohibited from addressing inquiries to private nonsuspect persons in the course of normal investigations. However, at a certain point the line separating mere contact from an investigative stop is crossed and at that point the protective operation of the Fourth Amendment is triggered. The Supreme Court acknowledged the problem in *Terry, supra,* 392 U.S. at 19, fn. 16, 88 S.Ct. at 1879, where it remarked:

"Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."

---

**4.** "Police officers have probable cause to make an arrest when 'at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [a person] has committed

or was committing an offense.' *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *United States v. Prince,* 548 F.2d 164 (6th Cir. 1977)." *U. S. v. McCaleb,* 552 F.2d 717, 720 (6th Cir. 1977).

And earlier in that same opinion, the Court declared "that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Id.* at 16, 88 S.Ct. at 1877. Whether a person's liberty has been restrained or not is to be judged not according to "what the defendant himself * * * thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes." *Coates v. U. S.*, 134 U.S.App.D.C. 97, 99, 413 F.2d 371, 373 (1969) *citing U. S. v. McKethan*, 247 F.Supp. 324 (D.D.C.1965).

 While the restraint exercised against the defendant here was not as forcible as that to which the appellant had been subjected in *Terry*, the Court is satisfied that from the moment that Agent Markonni identified himself as a DEA Agent and began to ask defendant questions on the sidewalk outside the terminal, a *Terry* stop had been effected. True, defendant could have ignored the agent and refused to converse with him, but such conduct on Coleman's part would have been, at the very least, a breach of etiquette, an act of discourtesy and incivility which would not be expected of the ordinary, reasonable person innocent of crime. In the opinion of this Court, when an officer, upon a show of authority accosts a *suspect*[5] and takes advantage of social pressures which inhibit the suspect from declining to deal with him, he restrains the suspect's liberty to the extent required to constitute a *Terry* stop. Since that adequately describes the instant case, the Court must now pass upon the sufficiency of the "specific and articulable facts" which the government has set forth in justification of this stop.[6]

At the hearing Agent Markonni testified that before the afternoon of September 26, 1976 he had had no dealings with or concerning the defendant. In addition it appears that he had no particular information to lead him to expect that an incident of drug-trafficking was going to involve that flight on that day. Therefore, all he knew at the time of the stop was (1) that defendant was coming from Los Angeles, (2) that he appeared to have no luggage with him, and (3) that he was black.[7]

 The fact of defendant's flight cannot be taken into account, for he did not flee until *after* the stop had been effected. Had he fled upon Markonni's approach or upon his display of his credentials, i. e., before the agent had the opportunity to complete the stop, his flight would properly be considered in weighing the sufficiency of the articulable facts on which Markonni

---

5. "Founded suspicion requires some reasonable ground for singling out the person stopped as one who was involved or is about to be involved in criminal activity." *U. S. v. Carrizoza-Gaxiola*, 523 F.2d 239 (9th Cir. 1975).

6. While it may well be true that "no fundamental public interest [is] at stake in routine enforcement of the drug laws which calls for the development of rules unique to airport drug searches," *U. S. v. Van Lewis*, 409 F.Supp. 535, 542 (E.D.Mich.1976), *reversed on other grounds sub nom., U. S. v. McCaleb, supra*, there is no question that the intrusion ordinarily worked by an airport stop is sufficiently minor and the interest of society in stemming the flow of illegal drugs is sufficiently grave to warrant inclusion of the *Terry*-type stop in the array of investigative devices available to law-enforcement officers in this context.

7. While ethnic background and, similarly, race are not features which can alone justify an investigative stop, they are one factor which may be taken into account, together with other pertinent circumstances, if some creditable rationale can be advanced to explain how race or ethnic background is significant in the given context. *U. S. v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *U. S. v. Canales, supra*; *Illinois Migrant Council v. Pilliod*, 398 F.Supp. 882 (N.D.Ill.1975), affirmed 540 F.2d 1062 (7th Cir. 1976), *rehearing en banc* 548 F.2d 715. In the instant case, Agent Markonni testified that experience has revealed that in this area whites who indulge illegally in controlled substances tend to prefer cocaine, while similarly situated blacks tend to favor heroin. It follows, then, that a black arriving from a major heroin distribution point arouses greater suspicion, *ceteris paribus*, than one arriving from a major cocaine distribution point. Since Los Angeles is the principal heroin distribution point in the nation, the argument could be made (and is implied in the testimony of Agent Markonni) that the confluence of these two factors—defendant's arrival from Los Angeles and his race—is to be considered as particularly significant.

acted. *U. S. v. Pope, supra.* This is what happened in *Pope* and the added weight of that factor was, in the mind of the Sixth Circuit, enough to tip the scales in that case, to validate what would otherwise have been an illegal stop.

From this perspective, then, the appellate court's assessment of the facts presented in *Pope,* another DEA airport stop case, takes on a particular significance. Until Mr. Pope fled, what the agent knew of him was that he was arriving on a nonstop flight from Los Angeles; that one month earlier he and a companion had purchased one-way tickets to Los Angeles, paying for them in cash in bills of large denominations; and that as the defendant proceeded through the terminal, he appeared nervous and cast furtive glances about. It further appears from the Court's summarization of the facts that the defendant claimed no luggage and carried none other than a briefcase. When the agent approached him and flashed his official identification, the defendant fled immediately. The Sixth Circuit expressed its considered opinion that up to the point of the defendant's flight, the agent did not have such reasonable suspicion as would justify the intrusion of the stop.

"Here, Agent Johnson was obviously intending to make a *Terry* stop when he approached Appellant to 'talk' with him. This intention was thwarted, however, by Appellant's flight at the moment the agent displayed his credentials. If the agent had actually succeeded in effecting an investigative stop by detaining Appellant for questioning at the time of the initial intrusion, the stop would have been invalid because the facts then known to the agent did not amount to 'reasonable suspicion' that Appellant was involved in criminal activity." *Id.,* 561 F.2d at 668. The court concluded "that Appellant's flight in the face of a clear showing of lawful authority supplied the agent with grounds to reasonably suspect that Appellant was engaged in criminal activity." *Id.*

Also illuminating to this Court is the Sixth Circuit's invalidation in *U. S. v. McCaleb, supra,* of an investigative stop undertaken under circumstances strikingly similar to those presented in *Pope* and in the instant case. The articulable facts on which the agent relied in that case were as follows: (1) three persons—one woman and two men—arrived in Detroit Metropolitan Airport on a direct flight from Los Angeles; (2) the men carried no hand luggage, the woman only a shoulder bag; (3) the previous evening, the woman and one of the men were seen at the Detroit Airport boarding a plane destined nonstop to Los Angeles and wearing the same clothes as on that day; and (4) at the baggage area awaiting delivery of their luggage, the woman and one of the men appeared to be nervous, while the remaining man did not. The court held unequivocally that "the circumstances of this case do not provide 'specific and articulable [sic] facts which, taken together with rational inferences from those facts, reasonably warrant[ed]' the intrusion of an investigatory stop." *Id.,* 552 F.2d at 720.

Mindful of the Supreme Court's counsel that "[n]o judicial opinion can comprehend the protean variety of the street encounter," *Terry, supra,* 392 U.S. at 15, 88 S.Ct. at 1876, and thus that "[e]ach case of this sort will, of course, have to be decided on its own facts," *id.* at 30, 88 S.Ct. at 1884, this Court appreciates that the precedential value of any case is somewhat diminished in this area. Nevertheless, the factual settings of these three cases—*Pope, McCaleb,* and the instant case—are sufficiently similar that the doctrine of *stare decisis* dictates that the rulings of the Sixth Circuit in *Pope* and *McCaleb* be accorded great weight in the decision of this case. All three cases arose out of investigative encounters between DEA agents and private citizens, at the major airport of a large metropolitan area.[8]

The government makes much of the skill, training, experience, and record of Agent Markonni and urges that in the light of those considerations the facts articulated in

---

**8.** The encounter involved in *McCaleb* occurred at Detroit Metropolitan Airport, the same airport as in the instant case. The events which became the subject of inquiry in *Pope* took place at Hopkins International Airport in Cleveland, Ohio.

justification of the intrusion here at issue are to be imbued with a particular, added significance. Leaving aside the fact that Markonni was one of the agents involved in the encounter which was disapproved in *McCaleb*, the Court is not persuaded that those accomplishments and qualities of Agent Markonni, even taking the government's characterization of them at face value, are sufficient to elevate the impulse which led him to make the stop here in issue from a mere, albeit educated hunch to the level of a prudent, reflective ratiocination.

It is true that certain language in *Terry* suggests that in a close case the court is to give a measure of deference to the reasoned judgment of the seasoned officer, so that an otherwise dubious undertaking gains legitimacy by virtue of the personal equation of the officer.

> "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." 392 U.S. at 27, 88 S.Ct. at 1883.

We must take care, however, to extend such deference judiciously, if not grudgingly, lest it completely overrun the safeguards so carefully delineated in the rest of the opinion.

> "The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate? [Citations omitted.] Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inartic-

ulate hunches, a result this Court has consistently refused to sanction. [Citations omitted.] And simple ' "good faith on the part of the arresting officer is not enough." . . . If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers, and effects," only in the discretion of the police.' " *Id.* at 21–2, 88 S.Ct. at 1880.

█ It is from that perspective and animated by the principles declared by the Supreme Court in *Terry* and applied by the Sixth Circuit in *McCaleb* and *Pope* that the Court must hold that the government has not in the instant case met its burden of establishing that the investigative stop here in question was constitutionally valid, since it finds that the government has not articulated sufficient specific facts to show that the stop was founded on reasonable suspicion that defendant was in some way involved in criminal activity.

That being the case, the Court need not consider the legality of defendant's arrest.

Accordingly, defendant's motion to suppress the illegally seized cocaine from evidence is to be granted.

IT IS SO ORDERED.