UNITED STATES, Appellee,

v.

Private First Class Randy D. FOSTER,
SSN 227–58–4501, United States
Army, Appellant.

CM 439191.

U. S. Army Court of Military Review.

17 March 1981.

Major Linus Johnson, JAGC, argued the cause for the appellant. With him on the brief were Colonel Edward S. Adamkewicz, Jr., JAGC, Lieutenant Colonel John F. Lymburner, JAGC, and Major Carlos A. Vallecillo, JAGC.

Captain Eugene R. Milhizer, JAGC, argued the cause for the appellee. With him on the brief were Colonel R. R. Boller, JAGC, Major Ted B. Borek, JAGC, and Captain Rexford T. Bragaw, III, JAGC.

Before RECTOR, CARNE and O'DONNELL, Appellate Military Judges.

## OPINION OF THE COURT

O'DONNELL, Judge:

Late in the evening of 13 July 1979, Special Agent James Giery, a criminal investigator and member of the local drug suppression team, was performing duty in the main bahnhof in Mainz, Federal Republic of Germany. Giery was one of four law en-

forcement personnel in the train station that night. They were engaged in a "surveillance and monitoring" operation whose purpose was to stop the flow of drugs from Frankfurt into Mainz.[1] According to Giery, one of the methods employed to this end was to question American soldiers who arrive on the Frankfurt train concerning their knowledge of drug activity in Frankfurt.

On the evening in question, which was a military pay day,[2] Agent Giery observed the appellant alight from the Frankfurt train. As he walked toward the appellant, Giery noticed him pause momentarily and then quicken his pace. As he walked into the station proper, the appellant glanced over his shoulder in Giery's direction several times. Giery drew abreast of the appellant, stopped him, identified himself, and obtained the appellant's military identification card. When the appellant asked Giery the reason for his actions, the agent replied, "Well, I'm just asking people—you know— I'm just talking to people getting off the trains from Frankfurt, and I'm just checking for guys coming in with drugs." The appellant stiffened slightly and denied being on the Frankfurt train, claiming that he had only placed his girlfriend on the train.

Giery then asked the appellant to identify his unit. The appellant, however, merely indicated a geographical location—Mainz-Gonsenheim. Upon further questioning, he stated that he was stationed at Lee Barracks in Mainz-Gonsenheim and that his unit was "CSC."[3] As Giery questioned the appellant, he concluded that the appellant was intoxicated because he was weaving slightly and was nervous. Giery could not detect the odor of alcohol on the appellant's breath, but he noticed that the pupils of his eyes were constricted. From this, Giery concluded that the appellant had recently used heroin and apprehended him at that point. As the appellant was being led away, two packets of heroin dropped from his sleeve. A later search of the appellant revealed a small amount of marihuana. After being warned of his rights under Article 31 of the Uniform Code of Military Justice, 10 U.S.C. § 831, and of his right to counsel, the appellant admitted possessing the heroin and the marihuana.[4]

At trial, the appellant moved to suppress the drugs as well as his statement, alleging an illegal stop and apprehension. The military judge denied the motion and the appellant was convicted of unlawfully possessing the drugs.

The Government's position at trial was two-fold: (1) the initial stop did not constitute a seizure within the meaning of the Fourth Amendment; (2) even if the original stop were a seizure, Agent Giery had a reasonable suspicion which justified the stop.[5] Before us, the Government has narrowed its focus to limit its argument to a contention that there was no seizure until the formal apprehension based on probable cause.

An arrest, which is the taking of a person into custody, must be based on probable cause. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).[6] While every arrest involves a seizure of the person, the converse is not true. As the Supreme Court held in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the police may in pursuing legiti-

---

1. Testimony at the trial indicated that illegal drugs were frequently procured in Frankfurt and taken to Mainz by train.

2. There was testimony that drug activity increased on payday.

3. The appellant's unit was Combat Support Company, 2d Battalion, 28th Infantry, 8th Infantry Division, which is located at Lee Barracks, Mainz-Gonsenheim.

4. The appellant was not previously warned of these rights.

5. The Government's further argument was that under either theory subsequent information justified the ultimate formal apprehension of the appellant. The military judge gave no reasons for his denial of the suppression motion.

6. An apprehension, which is the military analogue of a civilian arrest requires a "reasonable belief that an offense has been committed and that the person apprehended committed it." Article 7(b), Uniform Code of Military Justice, 10 U.S.C. § 807(b).

mate investigative functions seize a person in the absence of probable cause to arrest so long as the action is otherwise reasonable under the Fourth Amendment. The police officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1879. The Court noted that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person" within the meaning of the Fourth Amendment. *Id.* at 16, 88 S.Ct. at 1877. The Court recognized, however, that not all contacts between the police and the citizenry involve a seizure. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* at 19, n.16, 88 S.Ct. at 1878, n.16.

We first address the question of whether the initial stop amounted to a seizure within the meaning of *Terry* and the Fourth Amendment. The crucial determination is whether Agent Giery restrained the appellant's liberty by means of physical force or show of authority. The position of the Government at trial was that there was no seizure as the agents were questioning soldiers not as suspects but rather as concerned citizens who might have information about drug activities in Frankfurt. The federal courts have held that such police activity does not constitute an intrusion giving rise to the safeguards of the Fourth Amendment. A person so "stopped" is free to decline the invitation and walk away. *See, e. g., United States v. Wylie,* 569 F.2d 62 (D.C.Cir.1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978). It is different, however, when the police stop someone who they believe is engaged in criminal activity. Then there is a seizure within the meaning of *Terry* which must be reasonable under the Fourth Amendment. *See, e. g., United States v. Coleman,* 450 F.Supp. 433 (E.D.Mich.1978); *Crowder v. United States,* 379 A.2d 1183 (D.C.App. 1977).

Although the testimony on the issue is less than precise, we are convinced that the initial stop of the appellant amounted to a seizure. While there does appear to have been a policy of questioning soldiers concerning their acknowledge of drug activity in Frankfurt, it is clear that Agent Giery wanted to talk to the appellant primarily, if not exclusively, because he believed that he was in possession of drugs. Giery testified that the appellant's demeanor was suspicious and "I wanted to approach him and discuss his actions in Frankfurt and see if he had any drug information and I believed that he might have, possibly, had drugs on him." When the appellant asked Giery the reason for the stop, the agent informed him that he was talking to people getting off the Frankfurt train and "checking for guys coming in with drugs."

We are convinced that the appellant was detained by a show of authority.[7] There was a stop. The agent identified himself as a criminal investigator and demanded the appellant's military identification card. Under the circumstances, the appellant's liberty was effectively restrained. *See Brown v. Texas,* 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979), where the Supreme Court noted that when "the officers detained appellant for the purpose of requiring him to identify himself, they performed a seizure of his person subject to the requirements of the Fourth Amendment." We are not unmindful of Agent Giery's testimony to the effect that the appellant was free to walk away. However, this fact was never communicated to the appellant. Moreover, it flies in the face of reality to conclude that the appellant felt free to walk away or refuse to cooperate. *See Illinois Migrant Council v. Pilliod,* 398 F.Supp. 882, 899 (N.D.Ill.1975), *aff'd* 540 F.2d 1062 (7th Cir. 1976), where the court observed pertinently: "Implicit in the introduction of the agent and the initial questioning is a show of authority to which the average person encountered will feel

---

7. There is no evidence of physical force.

obliged to stop and respond." This conclusion is even more manifest in the instant case as Agent Giery was in possession of the appellant's identification card. Accordingly, we hold that there was a seizure that had to be justified under the Fourth Amendment.

To meet the Fourth Amendment requirements for a *Terry* stop, the prosecution is not bound by a probable-cause standard. The Government, however, must be able to demonstrate that the police officer had reasonable grounds to suspect that "criminal activity may [have been] afoot." *Terry v. Ohio, supra,* 392 U.S. at 30, 88 S.Ct. at 1884. This suspicion must be based on specific, objective facts. *Brown v. Texas, supra,* 443 U.S. at 51, 99 S.Ct. at 2640.[8]

▮ In the instant case, the objective facts relied on by the Government relate to the "suspicious" demeanor of the appellant in a high-crime area. The difficulty for the Government's purposes is that the appellant's behavior was consistent with innocent conduct and therefore was insufficient for Agent Giery to conclude that criminal activity was afoot. Being in a high-crime area is not itself a basis for concluding that the appellant was engaged in criminal activities, particularly as the crime area was a public place frequented by scores of innocent travellers. *See Brown v. Texas, supra,* at 52, 99 S.Ct. at 2641. Perhaps the single most significant factor in Giery's mind was the action of the appellant in quickening his pace and looking over his shoulder in response to Giery's appearance on the scene. While this behavior can be considered suspicious, it does not in our view constitute grounds for a seizure in the absence of other questionable circumstances. The result might be different if it could be demonstrated that the appellant recognized Giery as a policeman. The courts, however, are reluctant to justify a stop on such activity if the person is unaware that the other person is a policeman. *Compare People v.*

*Towers,* 49 A.D.2d 839, 373 N.Y.S.2d 593 (1975), with *United States v. Hall,* 525 F.2d 857 (D.C.Cir.1976), and *Jeffreys v. United States,* 312 A.2d 308 (D.C.App.1973). We recognize that Agent Giery testified that he thought the appellant recognized him. However, this is insufficient for us to conclude as a matter of fact that the appellant knew he was a policeman.

We hold that the circumstances known to Agent Giery at the time of the initial stop considered as a whole were inadequate to raise his hunch to the level of the reasonable suspicion required by the Fourth Amendment. Accordingly, the initial stop was illegal. *See Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). *Cf., United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *United States v. Thomas,* 10 M.J. 687 (ACMR 13 January 1981).

▮ Having so concluded, we perforce must hold the subsequent apprehension to be illegal. Likewise, the statements made by the appellant and the marihuana later discovered in the search of the appellant were inadmissible as "fruit of the poisonous tree." *Wong Sun v. United States, supra.* The heroin discarded by the appellant was also inadmissible as it was abandoned in the face of the illegal apprehension. *See United States v. Robinson,* 6 M.J. 109 (C.M.A. 1979).

The findings of guilty and the sentence are set aside and the charges are dismissed.

Senior Judge CARNE concurs.

RECTOR, Chief Judge, dissenting:

The drug suppression team possessed evidence from reliable sources, including nonsuspect soldiers whom they interviewed at the bahnhof, that Frankfurt was a major source of the illegal drugs flowing into the Mainz military community. There was ample reason to believe that the Mainz Bahnhof was the funnel of this drug traffic, and

---

8. In its most recent decision in this area, the Supreme Court articulated the standard thusly: "An investigatory stop must be justified by some objective manifestation that the person

stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). (Footnote omitted.)

plain clothes military policemen were assigned to the bahnhof to monitor, survey and deter possible drug trafficking and question soldiers returning from Frankfurt in order to develop additional information.

On the evening in question, Special Agent Giery and his partner were at the bahnhof because they believed that many soldiers had received their pay that day, would travel to Frankfurt by train, and return at that hour of the evening. When Giery observed the appellant get off the train from Frankfurt, he believed that he was a soldier who had just returned to Mainz from a high drug crime area by train, which he believed was the main conduit of drugs from Frankfurt to Mainz. Giery knew that his face and status as a police agent were well known in the Mainz area. He therefore justifiably took notice when the appellant seemed to spot him, became nervous, and tried to elude him.

Considering the totality of these circumstances, it was reasonable for Giery, a trained criminal investigator, to question the appellant, which he did in an unintrusive manner.* Standing alone, the appellant's action may not have caused an ordinary citizen to question the appellant's evasive actions. However, Giery was not an ordinary citizen, but instead a criminal investigator, having received specialized training as a drug suppression agent. He was well aware of the drug trafficking in the area, was well aware of the type of people involved and their methods and patterns of operation; and it is against this background and knowledge which we must test the reasonableness of Special Agent Giery's actions, which I find under the circumstances to be entirely proper and legal. In determining the reasonableness of a police officer's actions, Chief Justice Burger, in the principal opinion in *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), pointed out that:

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

I conclude that Special Agent Giery's questioning of the appellant did not constitute a seizure. He was justified in questioning the appellant and the facts and circumstances observed during the conver-

---

* When Giery approached the appellant he identified himself as a military policeman and told the appellant that he just wanted to talk with him for a minute. The appellant responded, "Sure." Giery then said, "May I see your ID card?" The appellant answered "Sure. What is this all about." Giery explained that he was talking to people getting off the Frankfurt train, which was true; and that he was "checking for guys coming in with drugs," which was obviously also a part of his mission at the bahnhof. Giery asked the appellant no self-incriminating questions during this conversation and, as he testified, the appellant was free to go. More significantly, there are no objective reasons from which the appellant could believe that he was not free to end the conversation and proceed on his way.

The Fourth Amendment does not require that the police officer refrain from all contact with private citizens. Instead it is designed to "prevent arbitrary and oppressive interferences by enforcement officials with the privacy and personal security of individuals." *United States v.*

*Martinez-Fuerte,* 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976). In *United States v. Mendenhall,* 446 U.S. 544, at 554, 100 S.Ct. 1870, at 1877, 64 L.Ed.2d 497 (1980), Justice Stewart stated:

> Moreover, characterizing every street encounter between a citizen and the police as a 'seizure,' while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices. The Court has on other occasions referred to the acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws. 'Without such investigation, those who were innocent might be falsely accused, and those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished. *Haynes v. Washington,* 373 U.S. 503, 515 [83 S.Ct. 1336, 1344, 10 L.Ed.2d 513] [1963].' *Schneckloth v. Bustamonte,* [412 U.S. 218, 225, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973)].

535

sation with the appellant provided probable cause for the subsequent apprehension of the appellant which yielded the evidence in question. Accordingly, I would affirm.