UNITED STATES of America,
Appellee,

v.

Vinicio E. RUIZ–ESTRELLA,
Appellant.

No. 784, Docket 73–1007.

United States Court of Appeals,
Second Circuit.

Argued April 12, 1973.

Decided June 11, 1973.

Phylis Skloot Bamberger, New York City (Robert Kasanof, The Legal Aid Society, New York City), for appellant.

Raymond J. Dearie, Asst. U. S. Atty. (Robert A. Morse, U. S. Atty., E. D. N. Y., L. Kevin Sheridan, Asst. U. S. Atty., of counsel), for appellee.

Before SMITH, HAYS and TIMBERS, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This case presents us with a distressingly familiar situation—the possession of a dangerous weapon by one attempting to board an airliner. On May 17, 1972, Vinicio Ruiz-Estrella was preparing to board a Miami-bound National Airlines flight at John F. Kennedy International Airport. A federal sky marshal searched the shopping bag that he was carrying, and found a sawed-off shotgun inside. After an unsuccessful attempt to suppress this evidence before Judge Neaher in the Eastern District of New York, Ruiz-Estrella stipulated that the minutes of the suppression hearing might serve as those of a trial to the court, and was convicted of various firearms offenses.

The major questions presented for review center on the seizure of the shotgun and the exclusion of both the defendant and the public from a portion of the suppression hearing. For the reasons below, we reverse the judgment of the district court.

## I.

The background facts may be quickly summarized. On the day in question, David Falen was serving as the ticket agent for National Airlines, checking passengers' tickets for the Miami flight. In the location of his ticket counter, and in the general boarding area, there were several posters reading as follows: "It is a Federal crime to: Carry concealed weapons aboard aircraft Interefere with flight crews Passengers and baggage subject to search under: Federal Laws and FAA Safety Regulations."

Pursuant to the FAA hijacking "profile," Falen identified Ruiz-Estrella as a suspect when the latter sought to check in for the Miami flight.[1] Falen marked appellant's ticket accordingly, and then asked for identification, which was produced in the form of a bank book, social security card, and union card.

Falen directed appellant to the seat location counter and gate area. He then notified David Angielski, the gate agent, that a profile "selectee" was approaching. In accordance with a prearranged signal, Angielski turned over appellant's ticket to John LaSota, a uniformed federal sky marshal.

LaSota then asked Ruiz-Estrella for identification. He was not satisfied with the bank book, since it had only a name on it, and lacked identifying remarks or an address. LaSota then took appellant into a stairwell at the end of the boarding ramp, and closed the door behind them. He asked for further identification, and was handed the social security and union cards. The former had the typed name "Vinicio Ruiz" on it, but was signed "Vinicio Ruiz-Estrella";

1. The factual background of both the profile and the general anti-hijacking system is described in detail in United States v. Lopez, 328 F.Supp. 1077, 1082–1092 (E.D.N.Y.1971). *See also* McGinley & Downs, Airport Searches and Seizures—A Reasonable Approach, 41 Fordham L. Rev. 293, 301–06 (1972); Note, Airport Security Searches and the Fourth Amendment, 71 Colum.L.Rev. 1038–40.

the latter bore the first name "Vincent." LaSota thought these to be discrepancies, but admitted that even if the identification had been letter-perfect, he nonetheless would have sought to examine the shopping bag which appellant was carrying.

Consequently, LaSota "told him [appellant] he would have to go through a baggage search."[2]  Ruiz-Estrella handed over the shopping bag, which appeared upon first glance to be filled with toys. LaSota picked up a box purportedly containing a toy truck, and found that the box was unexpectedly heavy.  Before putting it down, he further noticed that the original cellophane wrapping on the package had been opened and retaped. He opened the box and found the shotgun, along with several shells inside.[3]

## II.

The first point raised on appeal concerns the conduct of the suppression hearing.  Falen was the first government witness at that hearing.  Pursuant to the practice in the Eastern District, *see* United States v. Lopez, 328 F.Supp. 1077 (E.D.N.Y.1971); United States v. Bell, 464 F.2d 667 (2d Cir.), cert. denied, 409 U.S. 991, 93 S.Ct. 335, 34 L. Ed.2d 258 (1972), the government moved to exclude the defendant and the public from the courtroom during Falen's testimony, which was to deal with the secret "profile."  Defense counsel objected on "the confrontation and the Sixth Amendment," but the motion was granted, and the courtroom cleared.

■ In United States v. Bell, *supra*, we held that the exclusion of the defendant and the public from that portion of a suppression hearing dealing with the necessarily confidential hijacking "profile" abridged neither the right to confrontation nor that to a public trial.

We emphasized the strong public policy behind confidentiality in such circumstances, and noted that the rights of the defendant involved, while surely important, were not absolute.  Consequently, emphasizing the limited nature of the exclusion involved, we upheld the *in camera* procedure employed in *Bell*.

In United States v. Clark, 475 F.2d 240 (2d Cir. 1973), we again faced the problem of excluding a defendant from the suppression hearing.  The *Clark* defendant, however, had been excluded from the entire hearing, not just the limited portion dealing with the secret profile.  We emphasized that the approval of the *in camera* procedure in *Bell* had been limited to the exigencies at hand, i. e., the protection of the secret profile.  Consequently, exclusion from those parts of the hearing that dealt with other subjects was held to be an undue abridgement of the rights of confrontation and public trial.  In view of the basic nature of those rights, we reversed the judgment of conviction.

The holding in *Clark* mandates reversal here.  Only a small portion of the thirty pages of transcript covering Falen's testimony is devoted to the secret profile.  Unlike the ticket agent in *Bell*, who had no independent recollection of the defendant and could only testify as to his general practice, Falen specifically remembered what had happened here, probably because the suppression hearing was held within about two months of the incident, and described the day's events in some detail.

■ The government candidly conceded at oral argument that the exclusion here "technically" violates the *Clark* rule.  However, correctly noting that *Clark* involved a defendant who was excluded from the entire hearing, while appellant here was only excluded during

---

2.  On cross-examination, LaSota testified that he "asked" Ruiz-Estrella to submit to a baggage search.  For reasons which we spell out in detail in part III A *infra*, we find it unnecessary to resolve this apparent inconsistency, or even to decide whether an inconsistency exists.

3.  Upon subsequent questioning by the FBI, appellant admitted that he had bought the shotgun and sawed off its barrel.  He said that he had intended to rob a liquor store in Miami, and then flee to his native Santo Domingo.

Falen's testimony, the government urges that we find any error to be harmless in nature. Even assuming *arguendo* that denials of such fundamental rights as those to public trial and confrontation can ever be deemed harmless, *but see* United States v. Crutcher, 405 F.2d 239, 244 (2d Cir. 1968), cert. denied, 394 U. S. 908, 89 S.Ct. 1018, 22 L.Ed.2d 219 (1969); United States ex rel. Bennett v. Rundle, 419 F.2d 599, 608 (3d Cir. 1969) (*en banc*); Tanksley v. United States, 145 F.2d 58, 59, 10 Alaska 443 (9th Cir. 1944); Davis v. United States, 247 F. 394, 398 (8th Cir. 1917), we are unable to so conclude in this case. Falen's testimony here covered a multitude of points far outside the confidential scope of the profile. *Inter alia,* he maintained that he had "a recollection of this specific incident," recalled in detail the type of identification that Ruiz-Estrella produced, testified about the placement of the posters, remembered that appellant was carrying a shopping bag and that he had observed its contents, and testified that appellant did not act suspicious in any way, was accompanied by a girl who carried no luggage, and was the only selectee that day.

In light of the rather substantial amount of testimony wholly unrelated to the profile which both appellant and the public were barred from hearing, we are unable to conclude that the error here was "harmless beyond a reasonable doubt," Chapman v. California, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). With such fundamental constitutional rights at stake, and particularly in view of the fact that the suppression hearing in this case served as a trial on the merits, we cannot exclude "any reasonable possibility of prejudice from defendant's absence," Peterson v. United States, 411 F.2d 1074, 1080 (8th Cir.), cert. denied, 396 U.S. 920, 90 S.Ct. 247, 24 L.Ed.2d 199 (1969), or from that of the public. Consequently, we hold that the district court erred in excluding appellant from all of Falen's testimony, and that the judgment of conviction must be reversed.

## III.

Even if appellant had not been improperly excluded from portions of the suppression hearing, we would nonetheless be constrained to reverse the conviction here. We have concluded that the search of the bag and seizure of the shotgun by the sky marshal, under the particular circumstances of this case, cannot be justified under the Fourth Amendment.

At the outset, we think it patent that the seizure here was not predicated upon a showing of probable cause—indeed, the government does not so contend. The government conceded at argument that Ruiz-Estrella provided no one with any reason to be suspicious of him at the airport; Falen so testified during the suppression hearing. To be sure, Ruiz-Estrella did fit the hijacking profile, but no one contends that this statistical survey, which Judge Weinstein in *Lopez* described as identifying an armed individual about 6% of the time, 328 F.Supp. at 1097, can come close to supplying traditional probable cause for a search. *See* United States v. Meulener, 351 F.Supp. 1284 (C.D.Cal.1972).

Thus, if the seizure here is to be justified, a theory other than Fourth Amendment probable cause will have to be employed. We recognized this in *Bell, supra,* and upheld the seizure of narcotics from the person of a selectee there under the rationale of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Bell*, the suspect had not only met the profile, but had activated a magnetometer when he passed through it, was unable to supply any identification, and volunteered the information that he "had just been released from the Tombs and that he was out on bail for attempted murder and narcotics charges," 464 F.2d at 668–669. In light of those circumstances, we held that the sky marshal acted reasonably in conducting a "limited search of outer clothing" of the suspect, in order to avoid the perceived danger to himself and the airline-traveling public. *Id.* at 673–674.

Chief Judge Friendly concurred, but went further. Because of the great danger to human life and property posed by the hijacking threat, he suggested that

"the danger *alone* meets the test of reasonableness, so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage and with reasonable scope and the passenger has been given advance notice of his liability to such a search so that he can avoid it by choosing not to travel by air." *Id.* at 675.

Neither the panel opinion, written by Judge Mulligan, nor Judge Mansfield, who concurred separately, found it necessary to reach a conclusion, and hence deferred Judge Friendly's theory for another day.

In *Clark*, we emphasized that the frisk in *Bell* had been justified only by the peculiar circumstances in that case. We went on to note, 475 F.2d at 247:

"Absent proof of similar compelling circumstances or that Clark voluntarily and intelligently consented to the search, the opening and examination of Clark's bag would in our view be justifiable only upon a showing that he was aware that he had a right to refuse to be searched if he should choose not to board the aircraft. See United States v. Bell, *supra*, 464 F.2d at 675, 676 (concurring opinions of Chief Judge Friendly and Judge Mansfield); United States v. Meulener, 351 F.Supp. 1284 (C.D.Cal.1972); cf. United States v. Slocum, 464 F.2d 1180 (3d Cir. 1972)."

The inquiry in this case, then, is a tripartite one. We must consider whether the seizure here is justified either (1) on a consent theory; (2) because of the great danger of hijacking and because Ruiz-Estrella knew he could avoid the search by not boarding the plane; or (3) by "similar compelling circumstances" to those in *Clark*.

### A.

██ The government strongly urges that the seizure of the shotgun here was justified by Ruiz-Estrella's consent. The Supreme Court has recently had occasion, in Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 2045, 36 L. Ed.2d 854 (1973), to undertake a comprehensive review of the subject of consent searches. The Court began from the proposition that "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Id.* at 222, 93 S.Ct. at 2045, quoting from Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). While the question of voluntariness is one that must be resolved through an examination of "the totality of all the [surrounding] circumstances," *id.* at 227, 93 S.Ct. at 2048, the Court emphasized that the prosecution's burden could not be met by only showing acquiescence to a claim of lawful authority. *Id.* at 233, 93 S.Ct. 2041; *Bumper, supra,* 391 U.S. at 548–549, 88 S.Ct. 1788.

To be sure, the Court refused to adopt a rule requiring that the prosecution show, as an absolute prerequisite to a consent theory, that the suspect knew of his right to refuse the search. But it did note, as did this court in United States v. Mapp, 476 F.2d 67, 77 (1973), that absence of such knowledge is one factor to be considered on the issue of the voluntariness of a consent search. And, the Court, while refusing to place what it termed "artificial restrictions" upon consent searches, stressed that '[t]o approve such searches without the most careful scrutiny would sanction the possibility of official coercion." 412 U. S. at 229, 93 S.Ct. at 2048.

Since the inquiry necessarily focuses on the facts of a given case, it is to those at hand which we must now turn the mandated "careful scrutiny." Given the specific factual setting adduced at the hearing below, we are unable to conclude that the government has met its burden of proving voluntarily and freely given consent, absent the taint of implicit official coercion.

True, Ruiz-Estrella did hand over the bag to the sky marshal; it was not wrenched from his hands against his will. But this conduct, while admittedly relevant, will not suffice to meet the government's burden in this case. Whether we adopt the theory that appellant was told "he would have to go through a baggage search" (as LaSota stated on direct), or that he was "asked" to submit to such a search (as was testified on cross), is of little moment. The "request" took place after the agent, attired in a uniform and badge, took Ruiz-Estrella away from the boarding area, into a stairwell, and closed the door behind them. The fact that a suspect, who has not been warned of his right to refuse the search, silently hands over his bag in such circumstances will not support the inference of freely given consent.

It is instructive to contrast the situation here with that in *Bustamonte*, where the Supreme Court upheld a state court finding of voluntariness. There, the permission to search was elicited from an automobile passenger in the presence of five other companions, in a roadside encounter that was characterized as "congenial." Indeed, even the driver of the car testified that the assent to the search was freely given. The Supreme Court stressed that "the environment" in which the consent took place was not inherently coercive, being a far cry from custodial "interrogation in some remote station house." *Id.*, 412 U.S. at 247 and n. 36, 93 S.Ct. at 2058

Here, the environment in which the police questioning took place comes much closer to a traditional custodial situation. The suspect was taken away from public areas into a stairwell, the door was closed behind him, and only Ruiz-Estrella and the sky marshal were present. Under these particular facts, the government has shown no more than acquiescence to apparent lawful authority, and the theory of consent cannot be accepted. *See Lopez, supra,* 328 F.Supp. at 1093. *See also* United States v. Allen, 349 F.Supp. 749, 752 (N.D.Cal. 1972).[4]

### B.

■ We move on then, to Chief Judge Friendly's *Bell* theory, that a limited airport search is justified by the danger alone, as long as the defendant is aware of his ability to avoid the search by refusing to board the aircraft. Even assuming *arguendo* the correctness of this theory,[5] which the *Bell* majority did not adopt, the facts here do not amount to "a showing that he [appellant] was aware that he had a right to refuse to be searched if he should choose not to board the aircraft," *Clark, supra,* 475 F.2d at 247. The record makes it quite clear that neither the ticket agent, the boarding agent, nor the sky marshal made Ruiz-Estrella aware of any such option.

Nor can the posters be relied upon for such a showing. Even putting to one side the government's concession at argument that it does not rely at all on the posters in this case,[6] it is clear that the posters do not alert passengers to their ability to avoid search by refusing to

---

4. Nor would the mere posting of signs in the airport seem to meet the government's burden of showing voluntariness. *Meulener, supra,* 351 F.Supp. at 1288; *Lopez, supra,* 328 F.Supp. at 1092. We need not reach that question in this case, however, since the government maintained at oral argument, apparently in an attempt to minimize the difficulties arising from Falen's *in camera* testimony, that it did not rely upon the presence of the warning posters.

5. At least two commentators have viewed Judge Friendly's *Bell* concurrence as inconsistent with both *Terry* and general Fourth Amendment principles. *See* McGinley & Downs, *supra* n. 1, 41 Fordham L.Rev. at 315–16. *Cf.* Note, Airport Security Searches and the Fourth Amendment, *supra* n. 1, 71 Colum.L.Rev. at 1049–50, suggesting that conditioning exercise of the right to travel upon relinquishment of Fourth Amendment rights is constitutionally impermissible. In view of our disposition of this case, we express no views on the merits of either of these contentions.

6. *See* note 4, *supra.*

board. Indeed, there was but a single brief reference to the posters in the entire suppression hearing, and we would be loathe to infer from that both that appellant had seen them and had taken them to apprise him of his ability to avoid search. Whatever the merits of Judge Friendly's *Bell* concurrence, it is factually inapplicable here.

### C.

■ The final question then, is whether the seizure here can be justified on the less-than-probable cause standards of Terry v. Ohio, upon which we relied in *Bell*. In *Bell*, as we have noted above, we found present a number of "specific and articulable facts," *Terry, supra,* 392 U.S. at 21, 88 S.Ct. 1868, 20 L.Ed.2d 889, which justified the marshal's suspicion of danger. The suspect in *Bell* not only met the profile, but also activated a magnetometer, produced no identification, and admitted to a recent serious criminal history. In light of all these factors, we found the limited pat-down frisk of the passenger to be reasonable, and upheld the introduction into evidence of contraband found during that frisk.

Our *Clark* opinion noted that we would require "similar compelling circumstances" to justify the opening and examination of a passenger's bag. We think it patent that such circumstances do not here exist. Ruiz-Estrella neither passed through nor activated a magnetometer,[7] and it is conceded that he did nothing at all during the period in question that could be construed as suspicious in nature. At worst, he met the profile and produced marginally confusing identification, and any reliance on the latter factor must be negatived by the marshal's candid admission that the identification was irrelevant to the intended search.

The district judge sought to meet this absence of *Terry* "articulable facts" by

reasoning that had a magnetometer been used, it would have been activated, so that the marshal was simply acting as a "human magnetometer" when he opened appellant's bag. But such a conclusion not only ignores the settled principle that searches are not to be justified by what they turn up, Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), it also misconstrues much of what we said in *Bell*. There, we emphasized that the use of a magnetometer is "a reasonable caution" in view of the magnitude of the societal interests involved and the absence of "the personal indignities of the frisk." 464 F.2d at 673. *Cf.* United States v. Slocum, 464 F.2d 1180, 1182 (3d Cir. 1972); United States v. Epperson, 454 F.2d 769 (4th Cir.), cert. denied, 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972). The quite minimal invasion of privacy involved in use of the magnetometer is precisely the factor that recommends its broad use; the same logic cannot be employed to justify a necessarily more intrusive search for objects that the device, if initially employed, might have revealed.

We need not today decide, as the Fourth Circuit did in *Epperson, supra,* whether the frisk of a passenger can be justified solely through use of the magnetometer. We do note, however, that we regard the facts of that case, where the suspect activated the device a second time after removing several metal objects from his person, as presenting a far more compelling situation than the one at hand. Similarly, we need not decide what precise quantum of "specific and articulable facts" about the suspect and his behavior are necessary, either in and of themselves, *see* United States v. Moreno, 475 F.2d 44 (5th Cir., 1973); United States v. Lindsey, 451 F.2d 701 (3rd Cir. 1971), cert. denied, 405 U.S. 995, 92 S.Ct. 1270, 31 L.Ed.2d 463 (1972), in conjunction with use of the

---

7. There was apparently no metal-detecting device present in the particular gate where this incident took place. *Compare* the fact situation in *Bell* and *Lopez,*

both of which involved incidents at the same airport where magnetometers were present.

profile, *see* United States v. Riggs, 474 F.2d 699, 703 (2d Cir. 1973), or in conjunction with the combined use of the profile and magnetometer, *Slocum, supra; Lopez, supra,* to meet the *Terry* standard.[8] Especially when dealing with a concept as elusive as "reasonable suspicion," the inquiry will of necessity be a case-by-case one. *Compare Terry with* Sibron v. New York, 392 U.S. 40, 64, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). We hold only that under the particular facts of this case, where the suspect did nothing at all suspicious and did not activate the magnetometer, the *Terry* rationale will not support the search of his bag.

### IV.

We thus conclude that the seizure of the shotgun here cannot be justified under any applicable rationale, and that the motion to suppress, on the particular facts shown, should have been granted. We have also concluded, for the reasons noted in part II, *supra,* that the exclusion of both appellant and the public from part of the suppression hearing was in error. Consequently, the judgment of the district court is reversed.

HAYS, Circuit Judge (concurring and dissenting):

I agree with the majority that this judgment must be reversed. However, I concur in the opinion of the court only with respect to the exclusion of the defendant and the public from that portion of the suppression hearing during which ticket agent Falen testified to material unrelated to the FAA "profile" material.

I believe that the search which the appellant complains of in this case was lawful because the appellant consented to it. It is highly unrealistic to believe that this passenger was not aware that if he chose not to board the plane his baggage would not be searched. If it was ever true that passengers thought their baggage would be searched whether or not they boarded the plane, that day is long since past. In the absence

of evidence to the contrary, I would hold that appellant consented to the search of his luggage.

The very recent case of Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) lends support to this conclusion. There the Court said at p. 248, 93 S.Ct. at p. 2059:

"Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent."

---

8. *But see Meulener, supra,* where the court suppressed evidence obtained through a search of the luggage of a passenger who both met the profile and activated the magnetometer.