UNITED STATES of America, Plaintiff,

v.

Dennis Edward COLLIS, Defendant.

Crim. A. No. 81–80317.

United States District Court,
E. D. Michigan, S. D.

Dec. 23, 1981.

**1024**

Keith J. Norman, Asst. U.S. Atty., Detroit, Mich., for plaintiff.

N. C. Deday LaRene, Detroit, Mich., for defendant.

## MEMORANDUM OPINION

JULIAN ABELE COOK, Jr., District Judge.

Defendant, Dennis Edward Collis, is charged with possession of approximately 594.18 grams (net) of cocaine with intent to distribute, a violation of Title 21, Section 841(a)(1), United States Code. He brings this Motion to Suppress Evidence which was seized at the time of his arrest. Specifically, Defendant seeks to suppress approximately 654.86 grams (gross weight) of cocaine which was seized during a warrantless search of a shoulder bag that he was carrying at the Detroit (Michigan) Metropolitan Airport [Airport] on June 4, 1981.

Evidentiary Hearings were held before this Court on October 14, 1981 and October 19, 1981.

On June 4, 1981, Special Agents, Thomas Anderson [Anderson] and Gregory Demmink [Demmink] of the Drug Enforcement Administration [DEA] were on duty at the Airport, observing passengers deplaning from Delta Airlines Flight 1132. One of the first passengers to disembark was Defendant who was carrying a shoulder bag. He walked in a rapid manner from the gate area and down the concourse in the direction of the baggage claim area. Anderson followed Defendant, leaving Demmink at the gate to watch other passengers disembark. As Anderson followed him at a distance of thirty (30) feet, Defendant turned and looked at Anderson two or three times. Anderson followed him through the concourse and down to the Delta Airlines baggage claim area. Defendant, upon reaching the baggage claim area, made eye contact with, and nodded in the direction of, a man, who shortly thereafter stood up and left through one door, while Defendant exited through another door. Anderson observed Defendant on the sidewalk outside of the terminal and observed the "other" man standing near a parked car.

Anderson then decided that he would question Defendant. He approached Defendant, touched him lightly to gain his attention, and identified himself orally and by a display of his credentials. Anderson asked Defendant if he could ask him some questions. Defendant consented.

Anderson initially asked for identification from Defendant, who thereupon produced a Master Charge Card in his own name. When Anderson asked for an alternative form of identification, Defendant produced the Master Charge Card for a second time. Anderson, while retaining the charge card, then asked Defendant for his airline ticket. Defendant produced an airline ticket in his own name. Anderson, after noticing that Defendant had baggage claim stubs in his airline ticket envelope, asked Defendant whether he had checked any baggage. Defendant responded affirmatively, but explained that he had walked through the baggage claim area and outside the terminal to determine if his brother, who was to meet him, was waiting. Anderson asked Defendant whether the unidentified man, whom he had seen in the baggage claim area, was his brother. Defendant denied any knowledge of the unidentified man. Anderson again asked Defendant for additional identification. Defendant told An-

derson that his driver's license was in one of his checked bags. Anderson returned the Master Charge Card and the ticket envelope to Defendant.

At that point, Anderson noticed Defendant glancing towards the unidentified man. Defendant periodically asked Anderson "what's the problem?" However, other than identifying himself as a DEA Agent, Anderson did not explain the reason for his interest in Defendant. Throughout the exchange, Defendant appeared to be very nervous. Anderson asked Defendant whether he (Defendant) would accompany him (Anderson) to the baggage claim area so that an examination of the driver's license could be made. Defendant walked with Anderson to the baggage claim area, where they were met by Demmink. Anderson briefed Demmink on the events that had transpired and told him of his interest in Defendant, as well as in the unidentified man, who by that time, had returned to the baggage claim area.

While Anderson and Demmink stood by the baggage conveyor, waiting for Defendant's baggage to emerge, the unidentified man approached the group, and identified himself as a friend of Defendant. The second man took the shoulder bag from Defendant's shoulder. However, Demmink retrieved it and returned the shoulder bag to Defendant. When Anderson asked Defendant if the unidentified man was his brother, Defendant did not respond.

Defendant began to pace back and forth before the baggage conveyor belt. Anderson, anticipating that Defendant might attempt to leave the area, positioned himself between Defendant and the terminal doors. Nevertheless, Defendant bolted and ran for the terminal doors, with Anderson and Demmink in pursuit. Anderson observed Defendant turn left and run toward an adjacent parking lot which was surrounded by a cyclone fence, which ultimately blocked his path. Defendant threw his shoulder bag over the fence. He was then placed under arrest. Defendant's shoulder bag was retrieved by a passing airlines employee, who placed it in the possession of

Anderson and Demmink. Defendant and the retrieved shoulder bag were taken to the DEA Airport Office by Anderson and Demmink who searched the bag and found three or four plastic bags of white powder which field tested positive for cocaine. The white powder was later positively analyzed as cocaine by the DEA Regional Laboratory in Chicago. Defendant was then charged with violating the provisions of 21 U.S.C. § 841(a)(1).

Defendant argues that the evidence must be suppressed for two reasons. First, he argues that the confrontation with Anderson and Demmink at the Airport was a "stop" which was not predicated upon reasonable suspicion, *see, e.g., Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–81, 20 L.Ed.2d 889 (1968), and that the evidence as a "fruit" of this stop, *see, e.g., Wong Sun v. United States*, 371 U.S. 471, 484–87, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963). The Government maintains that no Fourth Amendment "stop" occurred at the Airport, or, alternatively, that the "stop" was justified by reasonable suspicion.

Second, Defendant argues that even if the first "stop" was proper, the evidence must be suppressed because the search of the luggage without a warrant violated his Fourth Amendment rights. *See, e.g., Arkansas v. Sanders*, 422 U.S. 753, 757–61, 99 S.Ct. 2586, 2589–92, 61 L.Ed.2d 235 (1979); *United States v. Chadwick*, 433 U.S. 1, 11, 97 S.Ct. 2476, 2483, 53 L.Ed.2d 538 (1977). The Government responds by asserting that, even though Anderson and Demmink conducted a search of the shoulder bag without a warrant, no right of Defendant was violated because he had "abandoned" the bag, *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924). The respective positions of the parties will be outlined in greater detail in the paragraphs that follow.

Defendant contends that he was "seized," within the meaning of the Fourth Amendment, when Anderson approached him, touched him lightly to gain his attention, and asked him if he would answer some questions. Defendant believes that he did

not have a choice as to whether he should or should not answer Anderson's questions or comply with his wishes, because it was "obvious" that he was not free to continue on his way. Defendant argues that no clearer show of authority can be imagined than a display of credentials by a law enforcement official, coupled with a request to question a citizen. Defendant further asserts that a "great segment" of the population shares his belief that if a law enforcement official asks to talk with a citizen, the individual will not be permitted to leave until the questions have been answered. Defendant asserts that the fact that Anderson and Demmink never specifically informed him that he could decline to speak with them not only underscores his testimony about Anderson's intentions, but it is significant in determining the nature of the assertion of authority involved.

Defendant asserts that "(i)t is clear that if this initial contact constituted a 'seizure,' and if that seizure was improper, then nothing which occurred thereafter is untainted by the initial impropriety, because all of the information gained thereafter—the Defendant's apparent nervousness, the conduct of the other person, the attempt to divert the shoulder bag and the Defendant's flight—all flowed from the initial seizure."

Defendant also argues that "it is clear that . . . Anderson did not have a sufficient basis to effect a *Terry* stop of the Defendant when he did." Defendant notes that such a seizure is justified only on the basis of a "reasonable and articulable suspicion that the person seized is engaged in criminal activity," and not an "inchoate and unparticularized suspicion or 'hunch,'" *citing Reid v. Georgia*, 448 U.S. 438, 439, 440–41, 100 S.Ct. 2752, 2753–54, 65 L.Ed.2d 890 (1980). Defendant contends that Anderson's decision to approach him was based on six distinct facts and circumstances; .to wit, (1) Defendant exited a flight which originated in Miami, a "source" city; (2) Defendant was one of the first people to disembark from the plane, presumably after traveling first class; (3) Defendant walked from the gate area and down the concourse in a rapid fashion; (4) Defendant was not dressed like a business man, and appeared to have been up all night; (5) Defendant turned around and looked at Anderson, who was following him on two or three occasions; and (6) in the baggage area, Defendant made eye contact with, and nodded to, an unidentified man, who left his seat and exited through a door which was different from that which Defendant exited.

Defendant asserts that common sense and the case law makes it clear that none of these circumstances, taken separately or collectively, justify Anderson's actions. Defendant argues that the objective facts which Anderson observed at the Airport were neutral on their face, and were not suggestive of criminality. Defendant further asserts that it would be a dangerous precedent to permit a law enforcement official to interrupt citizens in their comings and goings on the basis of that agent's suspicions regarding such subtleties of human interaction as eye contact and nodding.

Defendant denies that he abandoned his shoulder bag by throwing it over the parking lot fence. Defendant contends that, by this action, he did not evince an attempt to relinquish his interest in the property, as would be required for a finding that he "abandoned" the property, *United States v. Colbert*, 474 F.2d 174 (5th Cir. 1973). Rather, he argues, his acts represented a futile attempt to do whatever he could in order to maintain whatever privacy interests that he may have had in the bag. Defendant concludes that since he did not "abandon" the bag, and if the Court finds that Anderson did not "seize" or "stop" Defendant, or that the "seizure" or "stop" was unlawful in the first instance, the subsequent retrieval and search of the bag must be deemed to have been an unlawful warrantless search and the evidence found in the bag must be suppressed. Defendant notes that since the shoulder bag was clearly the kind of luggage or repository for personal property which is entitled to protection under the warrant requirement of the Fourth Amendment, under the cases of *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) and *Arkansas v. Sanders*,

442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), the Court must hold that the subsequent warrantless search of the bag was unlawful, and the evidence which was discovered under that search must be suppressed.

The Government notes that the question of when an investigative stop amounts to a seizure was addressed in *United States v. Jefferson*, 650 F.2d 854 (6th Cir. 1981). In that case, the United States Court of Appeals for the Sixth Circuit applied the test, which had been set forth in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) in determining whether a law enforcement official had "seized" the Defendant. That test, according to Justice Stewart, was that "a person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." The Government asserts that the instant case is distinguishable from *Jefferson, supra,* where the Defendant was accosted, ordered to accompany law enforcement officials to their office, and told that while he could refuse to consent to a search of his bags, the official would obtain a warrant if he did so, and proceed with the search. The Government concedes that the confrontation in *Jefferson, supra,* was a "seizure," because the Defendant was not given any choice in whether to accede to the officials' requests.

The Government notes that Anderson returned the Master Charge Card and the airline ticket envelope to Defendant after viewing them, which suggested that "there was not a problem immediately apparent." Anderson used no physical force to gain Defendant's attention, or to persuade Defendant to accompany him into the terminal. Anderson displayed no weapon, and spoke to Defendant in a normal tone of voice at all times. The Government submits that Defendant was not "seized" by Anderson, because his freedom of movement was not restricted by Anderson and he accompanied Anderson inside the building "in a cooperative frame of mind."

The Government submits that Anderson's contact with Defendant was justified as a permissible investigative stop on the basis of Defendant's suspicious behavior. The Government says that, in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that a "stop and frisk" amounts to a "seizure," and that there must be specific articulable facts that lead to rational inferences of criminal activity before the seizure is reasonable. In *Terry, supra,* the Court determined that the observations of the officer coupled with his many years of experience made his activities reasonable. The Government contends that the instant case is similar to *Terry, supra,* in that Anderson, an experienced law enforcement official in spotting suspects at the Airport, observed behavior that he believed to be indicative of drug transporting. The Government concedes that, at the time of Anderson's observation of Defendant's contact with the unidentified man, he did not have probable cause to arrest Defendant. However, the Government argues that Anderson, at that time, did have sufficient cause to justify stopping the Defendant to verify his identity. The Government asserts that the investigative stop involved in the instant case was reasonable under the circumstances.

The threshold question is under what circumstances may it be concluded that the actions of the agents constituted a "seizure" of Defendant. As the Supreme Court noted in *Terry v. Ohio, supra,* "obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry, supra* at 19, 88 S.Ct. at 1878–79. Judge Pratt of this Court determined, in *United States v. Coleman*, 450 F.Supp. 433 (E.D.Mich.1978), "police officers are not called upon to discard all vestiges of courtesy and friendliness, of civility and humanity, nor are they to be prohibited from addressing inquiries to private nonsuspect persons in the course of normal investigations." At a certain point, however, the line which

separates mere contact from an investigative stop is crossed and, at that point, the protective operation of the Fourth Amendment is triggered. Whether a person's liberty has been restrained or not is to be judged not according to "what the Defendant himself . . . thought, but what a reasonable man, innocent of any crime, would have thought had he been in the Defendant's shoes." *Coates v. United States*, 413 F.2d 371, 373 (D.C.Cir.1969), *citing United States v. McKethan*, 247 F.Supp. 324 (D.D.C.1965).

■ While the restraint exercised against Defendant in the instant case was not as forcible as that to which the appellant had been subjected in *Terry, supra*, the Court is of the opinion that from the moment Anderson identified himself with a display of credentials and began to ask questions of Defendant outside of the terminal, a *Terry, supra*, "stop" had been effected. Defendant could have ignored Anderson, or expressed his belief that he did not have to respond to questions. As Judge Pratt noted in *Coleman, supra*, however, "such conduct . . . would have been, at the very least, a breach of etiquette, an act of discourtesy and incivility which would not be expected of the ordinary, reasonable person innocent of crime," *Coleman, supra*, at 439. This Court determines that, as a matter of law, Defendant's belief that he was not free to leave when approached by Anderson, and that he was not free to refuse to answer the agent's questions, were reasonable beliefs which are held by reasonable citizens under these circumstances. Within the meaning of the Fourth Amendment, Anderson did "seize" Defendant outside of the terminal. The Court must now determine whether the "seizure" of Defendant's person was "reasonable," within the meaning of the Fourth Amendment.

This case arises out of the efforts of law enforcement officials to effectively stem the tide of narcotics and other controlled substances which flow into Michigan through the Airport. Although Anderson and Demmink eschewed reliance on the so-called "drug courier profile" which had been utilized in earlier cases, the issues presented in this case are similar to those presented in any case involving reliance by the DEA on such a profile.

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." Their is no question that Defendant, in this case, possessed this constitutional right of personal security as he walked through the Airport, as "the Fourth Amendment protects people, not places," *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576.

The Fourth Amendment requirement that searches and seizures must be founded upon an objective justification, governs all seizures of the person, "including seizures that involve only a brief detention short of traditional arrest." *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Terry v. Ohio*, 392 U.S. 1, 16–19, 88 S.Ct. 1868, 1877–79, 20 L.Ed.2d 889 (1968); *United States v. Brignoni-Ponce*, 422 U.S. 873 at 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607. Accordingly, if the Defendant was "seized" when Anderson approached and asked questions of him, the agent's conduct was constitutional only if he had reason to suspect Defendant of wrongdoing.

The case of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967) established that a stop may be justified on less than full probable cause if it does not violate the general proscription against unreasonable searches and seizures, 392 U.S. at 20, 88 S.Ct. at 1879. The Court went on, in *Terry, supra*, to define "reasonableness" in the context of an "on the scene stop":

> In justifying the particular intrusion the police officer must be able to point to specific and articulable facts which taken together with rational inferences from those facts reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who

must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate? ... Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction.

392 U.S. at 22–23, 88 S.Ct. at 1880–81.

In *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1971), the Court expanded somewhat on the parameters of police activity justified by *Terry, supra.* In upholding a stop and frisk on the basis of an informant's tip, the Court stated:

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response.... A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

407 U.S. at 145–46, 92 S.Ct. at 1923.

Both *Terry, supra*, and *Adams, supra*, involved instances in which the police had reason to suspect that the person stopped was armed and contemplating criminal activity. The "reasonableness" approach, however, has been extended to instances in which the public safety demands some minimal intrusion, such as the use of an airport magneometer. Both the Fifth and the Second Circuits have considered a series of cases in which airport security officers conducted warrantless searches of suspected skyjackers. In *United States v. Moreno*, 475 F.2d 44 (5th Cir. 1973), the Fifth Circuit

applied the rationale of *Terry, supra*, to uphold an airport stop of an individual who had been observed for several hours behaving in a suspicious manner. In *United States v. Skipwith*, 482 F.2d 1272 (5th Cir. 1973), the Court expanded on the balancing of interests underlying *Moreno, supra*, and went on to emphasize that the intrusion of the airport search is somewhat mitigated by (1) the option of the passenger to avoid the search by choosing not to board the plane and (2) the conduct of the search in the public view.

The Second Circuit has similarly upheld a number of airport searches and seizures under the reasonableness clause of the Fourth Amendment. *United States v. Bell*, 464 F.2d 667 (2d Cir. 1972); *United States v. Riggs*, 474 F.2d 699 (2d Cir. 1973). In *United States v. Ruiz-Estrella*, 481 F.2d 723 (2d Cir. 1973), however, the Court agreed to suppress the evidence which had been gleaned from the search of a suspect who fit the skyjacking profile and had produced a marginally questionable identification. The Court stated that these facts did not constitute "compelling circumstances" to justify the search of the passenger's bag, 481 F.2d at 729. Furthermore, if one of the mitigating factors, which support airport searches, is the passenger's awareness that he can avoid the search by choosing not to board the aircraft, then this Defendant's awareness of such an option further tainted the search.

However, the airport searches do warrant a cautionary note. While public safety demands some intrusion into the privacy of air passengers, some reasonable suspicion of illegal activity is required before a passenger may be lawfully subjected to a search. Moreover, the drug enforcement program at the Airport is not supported by the same concerns for public safety which underlie the anti-skyjacking measures. In an Opinion involving the airport program, Judge Joiner of this Court observed:

> As damnable as drug traffic is, its regulation involves the protection of no special public interests like those at play in airport security. Regulation of drug traffic

is achieved through enforcement of laws adopted by Congress which are similar to laws prohibiting bank robbery, bribery, or conspiracy. Thus, the court perceives no fundamental public interest at stake in routine enforcement of the drug laws which calls for the development of rules unique to airport drug searches. Accordingly, the government's rights in these cases must be tested against basic Fourth Amendment principles rather than by rules derived from an air pracy context.

*United States v. Van Lewis,* 409 F.Supp. 535, 542 (E.D.Mich.1976).

The border search cases present another area which bears upon the reasonableness of the stop and search program of drug enforcement officials. While a number of courts have considered the problems that have been raised in border searches in recent years, those issues were most cogently resolved in *United States v. Brignoni-Ponce, supra.*

While section 287(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1357(a)(1) authorizes warrantless interrogations of "any alien or person believed to be an alien as to his right to be or remain in the United States," the Court held in *Brignoni-Ponce, supra,* that the Fourth Amendment does not allow a roving patrol to stop a vehicle near the Mexican border and question its occupants about their citizenship and immigration status when the only ground for suspicion is that the occupants appeared to be of Mexican ancestry. The Court discussed at length the potential intrusion on normal traffic which would accompany a program of random steps:

> We are unwilling to let the Border Patrol dispense entirely with the requirement that officers must have a reasonable suspicion to justify roving patrol stops. In the context of border area stops, the reasonableness requirement of the Fourth Amendment demands something more than the broad and unlimited discretion sought by the government. Roads near the border carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well. San Diego, with a metropolitan population of 1.4 million, is located on the border. Texas has two fairly large metropolitan areas directly on the border: El Paso, with a population of 360,000, and the Brownsville-McAllen area, with a combined population of 320,000. We are confident that substantially all of the traffic in these cities is lawful and that relatively few of their residents have any connection with the illegal entry and transportation of aliens. To approve roving patrol stops of all vehicles in the border area, without any suspicion that a particular vehicle is carrying illegal immigrants, would subject the residents of these and other areas to potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers.

422 U.S. at 882, 95 S.Ct. at 2580–81.

Furthermore, the Court declined to approve even a limited identification stop unless the Border Patrol could point to specific factors indicating that the person in question might be an alien:

> The Government also contends that the public interest in enforcing conditions on legal alien entry justifies stopping persons who may be aliens for questioning about their citizenship and immigration status. Although we may assume for purposes of this case that the broad congressional power over immigration . . . authorizes Congress to admit aliens on condition that they will submit to reasonable questioning about their right to be and remain in the country, this power cannot diminish the Fourth Amendment rights of citizens who may be mistaken for aliens. For the same reasons that the Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country, it also forbids stopping or detaining persons for questioning about their citizenship on less than reasonable suspicion that they may be aliens.

422 U.S. at 883–84, 95 S.Ct. at 2581–82.

Even at an international border, the Fourth Amendment prohibits identification stops by roving patrols which are not based

upon an articulable suspicion of illegal activity. Even the very serious nature of illicit drug traffic cannot justify an identification stop in the absence of reasonable grounds to believe that the person in question is a drug courier.

The Supreme Court recently stated that such a seizure is justified only on the basis of "a reasonable and articulable suspicion that the person seized is engaged in criminal activity," and not an "inchoate and unparticularized suspicion or 'hunch,'" *Reid v. Georgia*, 448 U.S. 438, 440–41, 100 S.Ct. 2752, 2753–54, 65 L.Ed.2d 890 (1980).

■ According to Anderson's testimony, his decision to stop Defendant was based upon a number of supposed facts and circumstances, *see*, Memorandum Opinion, *supra*, at 1024–1025. This Court believes that none of these factors provide a legitimate basis for "reasonable suspicion" which is sufficient to justify the seizure of Defendant outside the terminal building.

As an example, the fact that the plane from which Defendant disembarked came from Miami, a "source" city, is of little moment. In *United States v. Andrews*, 600 F.2d 563, 566–67 (6th Cir. 1979), where the "source" city was Los Angeles, the Court noted that "such a flimsy factor should not be allowed to justify—or help justify—the stopping of travelers from the nation's third largest city."

That Defendant was among the first to disembark is also of little importance, especially in light of the fact that DEA agents, in other cases, have considered (1) the last passenger to disembark as an indicia of criminal conduct, *United States v. Vasquez*, 612 F.2d 1338 (2d Cir. 1980), (2) one of the middle of a line of deplaning passengers, *United States v. Buena Ventura-Ariza*, 615 F.2d 29 (2d Cir. 1980) or (3) a passenger who disembarked after three quarters of the other passengers.

All of the factors, which were relied upon by Anderson, were neutral. However, none of these factors were indicative of criminology or independently significant. *See United States v. Prince*, 548 F.2d 164 (6th Cir.

1977), where the United States Court of Appeals for the Sixth Circuit determined that certain facts, when evaluated collectively, warranted the belief that the Defendant had committed or was committing the offense of possessing narcotics. This record is barren of any facts which are essential to a determination of a "reasonable suspicion" which is a prerequisite to a valid *Terry, supra*, stop.

Law enforcement officials cannot satisfy the "reasonable suspicion" test of *Terry, supra*, by relying upon neutral factors as was done in the instant case. This Court is of the opinion that any number of factors might support a determination of "reasonable suspicion" that would justify the type of investigative stop involved in this case. However, the Court is also aware of the need to protect the rights of innocent persons from the unwarranted intrusion by governmental officials. Those factors, upon which law enforcement officials may rely in order to justify an investigative stop, must be: (1) sufficiently specific so that they are not susceptible to manipulation by law enforcement officials, and (2) sufficiently probative of criminal activity so that they will not ensnare innocent citizens and subject them to unwarranted investigative stops.

Accordingly, this Court is of the opinion that Anderson did not have a sufficient legal basis upon which to effect a *Terry, supra*, stop of Defendant. Furthermore, cocaine, which was confiscated by Anderson and Demmink at the Airport must be suppressed under the exclusionary rule, as set forth in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) because the discovery of the contraband was a "fruit" of the unlawful stop effected by Anderson and Demmink, *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

So Ordered.