Kareem PETERSON, Petitioner,

v.

Melvin WILLIAMS, Superintendent of Wyoming Correctional Facility, Respondent.

No. 93–CV–1669 (JG).

United States District Court, E.D. New York.

Oct. 18, 1995.

Philip L. Weinstein, Robert S. Dean, The Legal Aid Society, Criminal Appeals Bureau, New York City, for Petitioner.

Charles J. Hynes, Kings County District Attorney, Brooklyn, NY by Moira E. Casey, Roseann B. MacKechnie, and Victor Barall, Assistant District Attorneys, for Respondent.

## MEMORANDUM AND ORDER

GLEESON, District Judge:

Petitioner Kareem Peterson seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He was convicted in New York Supreme Court, Kings County, of third degree criminal sale of a controlled substance under N.Y.Penal Law § 220.39(1) (McKinney 1989). Petitioner claims that the trial proceedings giving rise to his conviction were deficient because they deprived him of his constitutional right to a public trial. Respondent does not dispute that petitioner has exhausted his state court remedies, and that this Court may reach the merits of the claim.[1]

---

**1.** Petitioner raised the instant claim before the Appellate Division, Second Department, which affirmed his conviction. *People v. Peterson*, 186 A.D.2d 231, 587 N.Y.S.2d 770 (2d Dep't 1992). The New York Court of Appeals granted leave to appeal and subsequently affirmed. *People v. Pe-* terson, 81 N.Y.2d 824, 595 N.Y.S.2d 383, 611 N.E.2d 284, 595 N.Y.S.2d 383 (1993). It is therefore clear that petitioner's public trial claim was fairly and adequately presented as one of federal constitutional dimension to the highest court of New York State. *See Picard v. Connor,*

For the reasons stated below, the petition is denied.

## BACKGROUND

After a one-day jury trial, petitioner was found guilty of selling a controlled substance. He was sentenced on October 3, 1990, to 6 to 12 years in prison.

At the trial, Police Officer John Faust identified petitioner as the person who had sold him two vials of crack on the corner of Classon and St. Marks in Brooklyn, in the early evening of August 3, 1989. The officer testified that just after 5:00 p.m. that day, while acting in an undercover capacity, he approached petitioner and asked if he had any "nicks."[2] Petitioner responded "yeah, how many," and when Faust indicated two, handed over two vials of crack cocaine. For these, Faust paid petitioner $10 in pre-recorded "buy money." He then observed petitioner walk away and stop at the corner of Classon and Bergen in front of a bodega. Finally, Faust testified that at the time of the incident, petitioner had been wearing gray pants and a green and white striped "Le Tigre–type shirt" bearing a small tiger insignia.

Police Officer Roberto Nieves, who had been serving as Faust's "ghost" backup on August 3, 1989,[3] also testified, but did not identify petitioner in court. He stated, however, that at the relevant time and place he observed Officer Faust conversing with a man who was wearing gray pants and a green "short sleeved polo-type shirt with white stripes."

Petitioner was arrested at the corner of Classon and Bergen at 5:10 p.m. The evidence at trial revealed that he had neither drugs nor buy money in his possession at the time of the arrest. A cigarette "twisted on the end" was recovered from behind his right ear, but testing revealed that it did not contain a controlled substance.

Before Officer Nieves took the stand at trial, the People moved to seal the courtroom for the duration of his testimony. After a closure hearing outside the presence of the jury, the court granted the application over petitioner's objection, reasoning that Nieves' continuing undercover work in the neighborhood made closure necessary.[4]

Pursuant to the closure order, spectators observing the trial were ushered out of the courtroom, and it was sealed. Nieves completed his testimony and was excused. The trial record indicates that the judge did not then order the unsealing of the courtroom, but instead allowed the proceedings to continue. The parties announced to the jury the following two stipulations: (1) that the two vials Officer Faust had obtained at the corner of Classon and St. Marks on August 3, 1989, contained cocaine; and (2) that the cigarette recovered from behind petitioner's ear did not contain any controlled substance. The People rested and defense counsel's motion for an order of dismissal was denied.

Petitioner then took the stand and testified for fifteen to twenty minutes.[5] He claimed that he had not possessed or sold drugs on August 3, 1989. Rather, he said he had gone to the grocery store on the corner of Bergen and Classon at the time of the alleged transaction in order to buy cigarettes. He stated further that at the time of the incident he had been wearing a turquoise blue Izod shirt with pink and white stripes, and that the emblem thereon was an alligator, not a tiger.

After petitioner testified, defense counsel's renewed motion for an order of dismissal was denied, and the jury was instructed on how to evaluate the parties' summations. Before summations were presented however, a

---

404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Daye v. Attorney Gen. of New York,* 696 F.2d 186, 190 n. 3 (2d Cir.1982), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984).

**2.** The term "nick" is used to denote a five-dollar quantity of marijuana or crack.

**3.** A "ghost" is an undercover police officer designated to protect the officer who acts as a buyer.

**4.** A prior application to close the courtroom during Faust's testimony was denied on the ground that Faust had not worked undercover for five months and it was unknown when he would resume such activity. (T. 50.)

**5.** This estimate of the amount of time the petitioner was on the stand was supplied by the trial judge. (T. 210.)

knock on the courtroom door alerted defense counsel to the fact that the courtroom had remained sealed after Nieves' testimony. At that moment the spectators who had earlier been ousted from the courtroom were readmitted. Neither of the parties have estimated the total amount of time the courtroom remained closed after the end of Officer Nieves' testimony, but the above facts suggest it was between 30 and 40 minutes.

Claiming that the petitioner's right to a public trial had been violated, the defense moved for a mistrial. The court reserved decision on the motion until after the guilty verdict was rendered. It then denied the application on the ground that the failure to reopen the courtroom had been unintentional, *i.e.,* it had not resulted from an improper, intentional extension of the original closure order. The court further opined that the defendant had not been prejudiced by the error.

On appeal, petitioner argued that the continued closure of the courtroom after Officer Nieves had completed his testimony violated petitioner's Sixth Amendment right to a public trial as applied to the states through the Fourteenth Amendment. The Appellate Division affirmed the judgment on the ground that the continued closure of the proceedings throughout petitioner's testimony had been inadvertent and there was no evidence that any observer wishing to enter the courtroom had been excluded. *People v. Peterson,* 186 A.D.2d 231, 232, 587 N.Y.S.2d 770, 772 (2d Dep't 1992). For these reasons, the court concluded, a new trial would not advance the purposes served by the Sixth Amendment. *Id.* The Court of Appeals affirmed, reasoning that the brief, inadvertent and unnoticed continuation of a proper courtroom sealing was not an affirmative act of the trial court to exclude persons from the courtroom, and consequently did not violate petitioner's constitutional rights. *People v. Peterson,* 81 N.Y.2d 824, 825, 611 N.E.2d 284, 285, 595 N.Y.S.2d 383, 384 (1993).

## DISCUSSION

■ The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a ... public trial ..." However, this right is not absolute, and in some circumstances may give way to overriding interests. *Waller v. Georgia,* 467 U.S. 39, 45, 104 S.Ct. 2210, 2214–15, 81 L.Ed.2d 31 (1984). A court confronted with an application to close a courtroom proceeding to the public must therefore determine which interests are paramount before granting or denying the request. *Id.; see also Woods v. Kuhlmann,* 977 F.2d 74, 76 (2d Cir.1992). In *Waller,* the Supreme Court set forth the following four-part analysis to assist courts in reaching this determination: "The party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced; the closure must be no broader than necessary to protect that interest; the trial court must consider reasonable alternatives to closing the courtroom; and it must make findings adequate to support the closure." 467 U.S. at 48; *see also Woods,* 977 F.2d at 76–78 (exclusion of members of the petitioner's family during testimony of witness who believed they posed a threat to herself and her family was proper under the *Waller* standard); *United States v. Hernandez,* 608 F.2d 741, 746–48 (9th Cir.1979) (same).

■ Petitioner does not challenge the decision to close the courtroom during Nieves' testimony, and, in fact, concedes it was proper. Instead, petitioner asserts that the second prong of the *Waller* test was violated, because the continued closure of the courtroom beyond the court's limited closure order was "broader than necessary" to protect the government's interest in maintaining Officer Nieves' cover.

Few cases deal with the inadvertent exclusion of the public during a defendant's trial. In *United States v. Al–Smadi,* 15 F.3d 153 (10th Cir.1994), the courthouse closed at 4:30 p.m., about 20 minutes before the defendant's trial had adjourned for the day. During that 20–minute period, the defendant's wife had been denied access to the courtroom. The Tenth Circuit nevertheless affirmed the district court's denial of a motion for a mistrial, stating that the "brief and inadvertent closing of the courthouse and hence the courtroom, unnoticed by any of the participants,

did not violate the Sixth Amendment." *Id.* at 154.

In *Snyder v. Coiner*, 365 F.Supp. 321, 323–24 (N.D.W.Va.1973), the doors to the courtroom were closed during summations by a deputy sheriff who had mistaken the judge's order to keep the courtroom quiet for a command to keep people from moving into or out of the courtroom. In denying a petition for habeas relief, the court reasoned that the closure had occurred during a relatively small portion of the entire proceeding, and that "[n]either the judge nor the parties were aware of any exclusion of the public taking place." *Id.* at 324.

Similarly, in the instant case, the continued sealing of the courtroom during petitioner's testimony went unnoticed by the petitioner and his counsel, the prosecutor, the judge, and the jury. The moment it was discovered, the doors were reopened. Indeed, the record indicates that the unsealing occurred before the judge had even observed that the original sealing was still in effect.[6] In addition, the unauthorized portion of the closure lasted for only a small portion of the total trial—only 12 pages[7] of the 218–page trial record were transcribed during that period.

Finally, and perhaps most significantly, the doors to the courtroom were immediately reopened to the public when a would-be spectator knocked on the door. This is not a case like *Al–Smadi* or *Snyder*, in which entry was attempted and denied without the authority of a proper closure order. As the Appellate Division noted, there is no evidence that anyone wishing to enter the courtroom after Nieves' testimony had been excluded.

Petitioner argues that *Snyder* is distinguishable because no one was actually removed from the *Snyder* courtroom, and because the closure occurred during summations and not during the taking of any testimony. Indeed, the *Snyder* decision recognizes the heightened need for public access to testimony: "Had the public been barred

from additional portions of the trial, particularly those involving the taking of testimony, a different result may have been required." 365 F.Supp. at 324.

It is indeed unfortunate that all of petitioner's testimony was taken outside the presence of spectators who may have wished to view it. However, in light of the other circumstances—the inadvertent nature of the continued sealing and the immediate compliance with spectators' requests to enter—this factor alone is insufficient to support a finding that petitioner's Sixth Amendment rights were violated. Moreover, the fact that spectators were excluded in this case does not require a different result, especially since the exclusion was effected pursuant to a lawful order.

Petitioner contends that the principles espoused by the Second Circuit in *United States v. Clark*, 475 F.2d 240 (2nd Cir.1973), and *United States v. Ruiz–Estrella*, 481 F.2d 723 (2nd Cir.1973), were violated by the continued closure. Both of those cases involved closure of the courtroom during testimony about the secret "hijacker profile" used by law enforcement to identify potential hijackers at airports. In *Clark*, the trial judge had excluded the public and the defendant from an entire suppression hearing to protect the confidentiality of the profile, about which a witness was expected to testify. The Second Circuit reversed Clark's subsequent conviction and remanded for a new suppression hearing. Although it reaffirmed the principle that the protection of the air travelling public was a sufficiently compelling interest to justify the limited closure of a criminal proceeding to the public, it held that the order closing the entire hearing was broader than necessary to protect the confidentiality of the security profile, and thus violated Clark's right to a public trial. *Id.* at 246.

In *Ruiz–Estrella*, the exclusion order applied only to the testimony of the witness

---

**6.** The following excerpt from the trial transcript shows that defense counsel brought the fact of the continued closure to the trial judge's attention after the doors had been opened:

> MS. ELLIOT: Judge, I just noticed when we stood up to start summations, that the courtroom was being unsealed for the very first time

and had not remained open when my client was testifying.

(T. 112.)

**7.** These 12 pages lie between page 99 and page 111 of the transcript.

who described the profile. The Second Circuit held that the order was nevertheless broader than necessary because only a small part of the witness' testimony was actually about the profile. The conviction was accordingly reversed. *Id.*

Thus, *Clark* and *Ruiz–Estrella* both involved exclusion orders that were unnecessarily broad as formulated. By contrast, it is undisputed that the closure order in this case was a proper means of protecting the confidentiality of Officer Nieves' identity. The challenge raised here is to the inadvertent continuation of a lawful order, an issue on which *Clark* and *Ruiz–Estrella* offer little guidance.[8]

Petitioner also relies on *Daniel v. Kelly,* No. 78–CV–830E, 1990 WL 130523 (W.D.N.Y. Aug. 31, 1990). In that case, the courtroom was ordered closed to protect the identity of an undercover agent/witness, and remained closed even after the trial court was told that the witness had testified in an open proceeding just six weeks earlier. On habeas review, the district court concluded that, by continuing to seal the courtroom after learning of the witness' prior exposure, the trial judge had made the closure broader than necessary to protect the witness' identity. *Id.* at *7.

Petitioner argues that the result in *Daniel* should obtain here. I disagree. *Daniel* involved erroneous closure, not inadvertent closure. After the trial judge became aware that the undercover agent had recently testified in open court, he consciously persisted in sealing the courtroom in violation of the right to a public trial. Here, by contrast, the trial judge apparently believed that her concededly lawful order closing the courtroom for Nieves' testimony had been executed precisely as she had formulated it. As it turned out, it had not, but the exclusion of the public from the courtroom was immediately ended the moment it was brought to light. Finally, it bears noting that the improper portion of the closure in *Daniel* was significantly more lengthy than the approximately 30–minute period petitioner's trial was improperly sealed.

Finally, petitioner argues that the continued closure, while inadvertent, nevertheless had the effect of undermining the purposes served by the constitutional right to a public trial. In *Waller,* 467 U.S. at 46, 104 S.Ct. at 2215, the Supreme Court described these purposes as follows: (1) to ensure that the accused is tried fairly; (2) to remind the prosecutor and the judge of their responsibility to the accused and of the importance of their functions; (3) to encourage witnesses to come forward; and (4) to discourage perjury. *See also In re Oliver,* 333 U.S. 257, 271, 68 S.Ct. 499, 506, 92 L.Ed. 682 n. 25, 68 S.Ct. 499, 506 n. 25 (1948); *Douglas v. Wainwright,* 739 F.2d 531, 532 (11th Cir.1984), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985).

There is little reason to believe that these purposes will be served by granting the requested writ. First, the public was allowed to watch the greater portion of the trial, including all of the prosecution's case (except for the part that was properly sealed). Second, the inadvertent nature of the continued closure virtually eliminates any concern that the trial lacked the usual deterrent to prosecutorial or judicial abuses that is provided by public trials. If the authorities were unaware that their actions were protected by a closure order, they were no more likely to give way to such abusive impulses than if they had had no such protection. Finally, there was ample time for potential witnesses to come forward, and there is no indication in the record that the inadvertent extension of the closure order precluded any from doing so.

### ORDER

For the foregoing reasons, petitioner's claim for habeas corpus relief is denied and the petition is dismissed. The Clerk of the Court is advised that this Order closes the case.

So Ordered.

---

8.  These cases are further distinguishable because in both, *the defendants* were excluded along with other members of the public. Here, petitioner was never required to leave the courtroom.